# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Blue Cross Blue Shield of Michigan
Mutual Insurance Company and Blue Care
Network of Michigan,

                Plaintiffs,

    v.

Express Scripts, Inc.,

                Defendant.

**JURY TRIAL
REQUESTED**
Civil Action No.
Hon.

## COMPLAINT

Plaintiffs Blue Cross Blue Shield of Michigan Mutual Insurance Company ("BCBSMI") and Blue Care Network of Michigan ("BCN") (collectively, "BCBSM") bring this action against Defendant Express Scripts, Inc. ("Express Scripts").[1] Plaintiffs allege as follows:

## INTRODUCTION

1.      BCBSMI is a nonprofit mutual insurance company and the largest health insurer in Michigan, serving more than 5 million people, and BCN is a nonprofit health maintenance organization in Michigan with more than 800,000 members. Express Scripts is one of the three largest pharmacy benefit managers in the United States. Prior to 2022, BCBSM engaged Express Scripts as the pharmacy benefit manager ("PBM") for its health plans. Express Scripts' role was to negotiate the procurement and dispensing of prescription products, manage a network of retail,

---

[1]      BCBSM's complaint includes a handful of quotations from the parties' 2019 MSA (defined below). The 2019 MSA includes a provision requiring the parties to keep the terms of the agreement confidential, except as required by law or regulation. Therefore, BCBSM has redacted any quoted language from the 2019 MSA out of an abundance of caution, and to provide the parties with an opportunity to confer about whether this language meets the sealing standards set forth in Local Rule 5.3(b) and *Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299 (6th Cir. 2016). Unless directed otherwise by the Court, and if no motion to seal is filed in the interim, BCBSM will proceed with filing an unredacted version of the complaint on the public docket 21 days after serving Express Scripts with the complaint. Finally, because BCBSM is serving Express Scripts with copies of both the publicly filed redacted version and the unredacted version of complaint, any subsequent filing should in no way alter Express Scripts' deadline to respond to the complaint.

mail order, and specialty pharmacies, and adjudicate and process pharmacy claims to help BCBSM reduce costs for BCBSM's plan members.

2.     Rebates from manufacturers constituted a material component of this arrangement.  Pursuant to successive contracts, Express Scripts was obligated to remit to BCBSM the greater of either the actual rebates obtained pursuant to the contracts or the guaranteed minimum rebates for products with a brand classification, unless an express contract exclusion applied.

3.     In July 2020, after BCBSM issued a request for proposal ("RFP") for its next PBM services contract, Express Scripts suddenly informed BCBSM that it would keep guaranteed rebates for certain branded medical products that were required to be remitted to BCBSM.

4.     Express Scripts told BCBSM that Express Scripts had determined the operative contract had not provided for such guaranteed rebates, notwithstanding that Express Scripts could point to no exclusion in the contract and that Express Scripts' newfound position contravened its course of performance over several years under the operative and prior contract.

5.     Yet a short time later, though, Express Scripts offered the guaranteed rebates it wrongfully kept back to BCBSM as part of Express Scripts' proposal in response to BCBSM's RFP for the new PBM services contract.  In other words, Express Scripts unilaterally kept guaranteed rebates which it had been paying to

BCBSM as required under the contracts for years prior and used BCBSM's own guaranteed rebates as deal leverage. Express Scripts has never returned the guaranteed rebates that it unlawfully kept and unsuccessfully tried to use as negotiating leverage. To the contrary, Express Scripts converted those guaranteed rebates for its own use.

6.     In the meantime, Express Scripts' unlawful tactics prompted BCBSM to exercise its audit rights under the parties' agreement and engage an auditor to assess Express Scripts' conduct more broadly. As the auditor detailed, Express Scripts was not merely diverting to its own use the guaranteed rebates for certain medical products (as it had admitted), but Express Scripts was also incorrectly applying guaranteed minimum rebate exclusions that were not permitted under the parties' contract for several other product categories that it had failed to disclose to BCBSM.

7.     To date, Express Scripts has wrongfully kept and failed to remit to BCBSM guaranteed rebates in excess of $75,000.

**PARTIES, JURISDICTION, AND VENUE**

8.     Plaintiff Blue Cross Blue Shield of Michigan Mutual Insurance Company is a Michigan mutual insurance company with its principal place of business located at 600 E. Lafayette Blvd., Detroit, Michigan 48226.

9.      Plaintiff Blue Care Network of Michigan is a Michigan health maintenance organization with its principal place of business located at 20500 Civic Center Drive, Southfield, Michigan 48076.

10.     Defendant Express Scripts, Inc. is a Delaware corporation with its principal place of business located at 1 Express Way, St. Louis, Missouri 63121. Express Scripts has a resident agent in Michigan, and it conducts significant business activities directed at Michigan.

11.     This Court has jurisdiction over this dispute under 28 U.S.C. § 1332 because BCBSMI and BCN are citizens of Michigan, Express Scripts is a citizen of Missouri and Delaware, and the amount in controversy is over $75,000.

12.     This Court has personal jurisdiction over Express Scripts under MCL § 600.715 because Express Scripts conducts significant business activities in the State of Michigan that directly relate to the subject matter of this Complaint.  Express Scripts further purposefully availed itself of the law of the State of Michigan when it entered into a contractual agreement with two Michigan-based companies, BCBSMI and BCN, contemplating the provision of pharmacy benefit management services to be primarily provided in the State of Michigan.  Finally, Express Scripts' conduct described herein caused direct, foreseeable harm to BCBSM in this District. Venue is proper under 28 U.S.C. § 1391 for the same reasons.

## FACTS

### I.   Pharmacy Benefit Managers

13.    BCBSM provides health insurance and other health plan services to self-funded and fully insured group health plans and fully insured individuals.  In doing so, BCBSM ensures that its members can access the prescription products that their providers prescribe.  Health plans, including BCBSM, typically enlist a PBM to assist with this role.

14.    PBMs are companies that administer prescription drug benefits on behalf of health plans, employers, and other organizations.  PBMs thus contract with pharmaceutical manufacturers, health insurers, and pharmacies, among others, to manage the pharmacy benefits to which the insurers' subscribers are entitled. Among other things, PBMs negotiate prices with pharmaceutical manufacturers and process prescription claims.  Express Scripts is a PBM.

15.    A core function of a PBM is to contract with pharmaceutical manufacturers for their products.  Pharmaceutical manufacturers often offer rebates to PBMs in exchange for the prospect of improved sales of their products.  A PBM can often achieve higher rebates if its health plan customers will place the manufacturer's products on their formularies.  A formulary is a list of products for which the health plan will provide coverage to its customers, and placement on the formulary increases the likelihood any given product will be prescribed.  Because

PBMs can achieve higher rebates if their health plan customers place products on their formularies, PBMs will typically pass on a portion of those rebates to the health plans.

16.     Having a large health plan customer is extremely lucrative for a PBM. In fact, having a large health plan customer is so lucrative that PBMs, such as Express Scripts, are even willing to guarantee their health plan customers that they will achieve a minimum amount of rebates per claim, subject to certain exclusions.

## II.     The 2019 MSA

17.     Express Scripts was BCBSM's PBM under a Pharmacy Benefit Manager Master Agreement with an effective date of January 1, 2019 (the "2019 MSA").  Express Scripts agreed under the 2019 MSA to pay BCBSM guaranteed minimum rebates for branded products, subject only to limited, specifically enumerated exclusions.

18.     BCBSM's contract with Express Scripts provided that if Express Scripts did not achieve the guaranteed rebate threshold, then Express Scripts would be required to remit to BCBSM the difference between the actual rebates that BCBSM received, and the minimum guaranteed rebate.  This case is about Express Scripts' failure to pay those guaranteed rebates.

19.     Ignoring the plain language of the 2019 MSA, Express Scripts systematically undercounted the number of claims subject to its obligations to pay

guaranteed rebates. Through this conduct, Express Scripts attempted to avoid paying the amounts due to BCBSM.

20.     Simply put, Express Scripts unilaterally excluded certain claims from guaranteed rebates, contrary to the terms of the 2019 MSA, to retain money owed to BCBSM for its own use and benefit and make the 2019 MSA even more profitable to Express Scripts.

## III.    Express Scripts Withholds Rebates Under the 2019 MSA

21.     In February 2020, in anticipation of the 2019 MSA's scheduled expiration at the end of 2021, BCBSM began soliciting bids for a new PBM contract from both Express Scripts and from other PBMs, which could potentially replace Express Scripts as BCBSM's PBM once the 2019 MSA expired. Among these other PBMs were Optum Rx and CVS Caremark, Express Scripts' two primary competitors.

22.     Notwithstanding the agreement of the parties in the 2019 MSA, shortly after BCBSM began soliciting bids from other PBMs, on July 27, 2020, Express Scripts suddenly informed BCBSM that Express Scripts would stop paying guaranteed rebates to BCBSM for branded medical supplies even though Express Scripts and its predecessor had been guaranteeing these rebates for several years.

23.    In its notification to BCBSM about its abrupt change of practice, Express Scripts claimed that its payment of those guaranteed rebates was supposedly a mistake.

24.    As reflected in the chart below for BCBSM's commercial PPO line of business, Express Scripts subsequently began reporting a sharply reduced number of claims subject to guaranteed rebates and stopped remitting guaranteed rebates for branded medical supply claims.



25.    This sudden change in practice also coincided with Express Scripts' integration into its new parent, Cigna Healthcare ("Cigna").  During a call with investors in 2020, a Cigna executive explained that "[d]uring 2020, we completed

the integration of our combination with Express Scripts and delivered on our integration priorities including revenue growth, cash flow generation, deleveraging targets [*i.e.*, its targets for paying off the debt it incurred to purchase Express Scripts], [and] strong client retention . . . ."

26.     BCBSM immediately protested Express Scripts' reversal, explaining that it did not understand how Express Scripts could characterize the prior payments of guaranteed rebates by Express Scripts as a mistake when the parties had unequivocally intended for branded medical supplies to be eligible for guaranteed rebates.

27.     On October 23, 2020, Express Scripts offered to reverse its position on these guaranteed rebates for branded medical supplies only if BCBSM renewed BCBSM's PBM contract with Express Scripts.

28.     BCBSM rejected the offer, declined to renew its contract with Express Scripts, and contracted with Optum Rx to provide PBM services once the 2019 MSA expired.

29.     To this day, Express Scripts has never returned the wrongfully kept guaranteed rebates to BCBSM.

## IV.     Express Scripts' Withholding of Guaranteed Rebates for Branded Medical Supplies Appears to Have Been Pretextual

30.     Express Scripts' years-long payments of guaranteed rebates on branded medical supplies was not a mistake.  The parties expressly intended and agreed that

Express Scripts would pay guaranteed rebates for these products under the 2019 MSA, just as Express Scripts and its predecessor had done under the prior contract.

31.    Historically, BCBSM had used Medco Health Solutions, Inc. ("Medco") as its PBM.

32.    On July 20, 2011, Express Scripts Holding Company—Express Scripts' parent company at the time—acquired Medco.

33.    On January 1, 2015, BCBSM and Medco, which was then affiliated with Express Scripts, entered into a Restated Pharmacy Benefit Manager Master Agreement (the "2015 MSA"), with a term expiring on December 31, 2017.  The 2015 MSA automatically renewed at one-year intervals until terminated by one of the parties, and ultimately terminated in 2018.

34.    In early 2017, BCBSM and Medco amended the 2015 MSA to include, among other things, a guaranteed rebate provision that was substantively identical to the guaranteed rebate provision in the 2019 MSA (the "2017 Amendment").  From the 2017 Amendment until the expiration of the 2015 MSA, Medco paid guaranteed rebates for branded medical supplies.

35.    As BCBSM and Express Scripts were negotiating the 2019 MSA, BCBSM expressly asked Express Scripts to confirm that Express Scripts would continue to pay guaranteed rebates for branded medical supplies under the renewed contract.

36.    In or about August 2017, Express Scripts confirmed in writing to BCBSM that it, in fact, would continue to pay guaranteed rebates on branded medical supplies.

| Minimum Rebate Guarantees will be quoted on a Per Brand Claim basis. This definition will include all brand claims inclusive of OTC products and supplies with a brand classification. | Confirmed |
|---|---|

37.    If Express Scripts had mistakenly been paying guaranteed rebates on a category of products under the 2015 MSA, as amended, Express Scripts had an obligation to say so when directly asked if it would continue to pay guaranteed rebates on those same products. But Express Scripts did the opposite.

38.    This guarantee was material to BCBSM. Under the prior contract, Express Scripts remitted guaranteed rebates for branded medical supplies to BCBSM, and it was imperative for BCBSM that Express Scripts continued to remit guaranteed rebates under a new contract.

39.    In agreeing to the terms of the 2019 MSA, BCBSM reasonably relied upon Express Scripts' affirmative representation that it would pay guaranteed rebates for branded medical supplies to BCBSM.

40.    Express Scripts' affirmative representation to BCBSM that "brand claims" would be "inclusive of . . . supplies with a brand classification" was a material inducement to BCBSM to enter the 2019 MSA.

11

41.     Express Scripts knew or should have known that the term was material and that BCBSM would rely on its representation, which is why it was careful to confirm to BCBSM that it would remit guaranteed rebates for branded medical supply claims.

42.     The parties' agreement was memorialized in the guaranteed rebates terms of the 2019 MSA.

43.     The parties subsequently executed the 2019 MSA with the intent that Express Scripts would pay guaranteed rebates for branded medical supplies.

44.     Under the contract, Express Scripts agreed to pay guaranteed rebates on Brand Name Drugs, which were defined as "█████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████" 2019 MSA § ██; *see also* 2019 MSA Schedule ██ §§ ██.

45.     Branded medical supplies had National Drug Codes in the First DataBank National Drug Data File.

46.     Branded medical supplies were classified as branded using the Brand/Generic Algorithm, which is Express Scripts' proprietary algorithm.

47.     This classification of branded medical supplies under the Brand/Generic Algorithm was consistent with the parties' agreement that those products would be eligible for guaranteed rebates.

48.     Further, Section ▊ of Schedule ▊ to the 2019 MSA ("Schedule ▊") provides a list of all the categories of claims that did not qualify for guaranteed rebates and made plain that "▊▊▊" those listed claims "▊▊▊▊▊▊▊▊▊▊▊▊▊▊."

49.     Branded medical supplies are not on this exclusion list in Schedule ▊.

50.     Indeed, as it had for the term of the 2015 MSA following the 2017 Amendment, Express Scripts paid guaranteed rebates for branded medical supplies for the first 12 months of the 2019 MSA, reflecting that Express Scripts understood these products to be eligible for such rebates.

51.     This was also consistent with industry practice and usage, with the term "drug" understood by PBMs and insurers to refer to any medical product covered by health plans under a prescription drug benefit and as it relates to the scope of PBM contracts and the scope of related guaranteed rebates.

52.     There is no good faith basis for Express Scripts' unilateral decision to stop paying guaranteed rebates for branded medical supplies only months after BCBSM kicked off its RFP process for its upcoming PBM contract.

## V.     An Audit Reveals the Extent to which Express Scripts Underpaid BCBSM

53.     Following Express Scripts' conversion of the guaranteed rebates for branded medical supplies for its own use, BCBSM hired an auditor specializing in the healthcare industry, Pharmaceutical Strategies Group, LLC ("PSG") to review the 2019 MSA and Express Scripts' compliance with its obligation to pay guaranteed rebates to BCBSM.

54.     In January 2022, BCBSM sought Express Scripts' consent to use PSG for this audit, and Express Scripts gave its approval.

55.     In October 2022, the auditor issued a report on years 2019 and 2020 (the "First Audit Report"), and in January 2023, it issued an audit report for the year 2021 (the "Second Audit Report," together with the First Audit Report, the "Audit Reports").  In the Audit Reports, PSG concluded that Express Scripts had violated the 2019 MSA and wrongfully kept guaranteed rebates in excess of $75,000 owed to BCBSM for claims involving branded medical supplies.

56.     The auditor also quantified Express Scripts' failure to pay guaranteed rebates for other categories of claims as well, resulting in additional harm to BCBSM in excess of $75,000.

### A. Express Scripts Misclassified Certain Branded Product Claims as 340B Claims

57.     The auditor detailed that Express Scripts wrongfully excluded from guaranteed rebates a large number of branded product claims as 340B claims.

58.     Under Section ██ of Schedule █, "███████████████████

███████████████████████" are specifically ineligible for guaranteed

rebates.  The "340B program" refers to Section 340B of the Public Health Service

Act, which requires drug manufacturers to provide discounts on outpatient drugs to

certain covered healthcare organizations.  Covered healthcare organizations are

typically hospitals or other patient care facilities.  Pharmacies cannot qualify as

covered healthcare organizations under 340B, but 340B-covered entities may

operate or contract with pharmacies to fill prescriptions that qualify for 340B

discounts.

59.     For a branded product claim to constitute a 340B claim, several criteria

must be met, including:  (1) the product was prescribed by a 340B-covered entity

provider, (2) it was received by a patient of the 340B-covered entity, and (3) it was

filled by a pharmacy operated by a 340B-covered entity or that contracts with the

340B-covered entity.

60.     However, PSG detailed that, instead of confirming whether a given

claim met all necessary criteria, Express Scripts took a shortcut and treated certain

non-340B claims as 340B claims.

61.     This systematic misclassification resulted in a large number of claims

being wrongfully excluded from guaranteed rebates under the 2019 MSA, and the

underpayment of guaranteed rebates in excess of $75,000.

### B. Express Scripts Misclassified Certain Branded Products as Generic Products

62.     The auditor also detailed that Express Scripts wrongfully excluded certain claims for branded products from guaranteed rebates under the 2019 MSA by intentionally misclassifying them as generic products.

63.     Notwithstanding that under the terms of the 2019 MSA, guaranteed rebates apply to all claims for branded medical products not specifically excluded under Section █ of Schedule █, Express Scripts used its mail-order pharmacy to circumvent the payment of certain guaranteed rebates.

64.     Specifically, for certain claims, Express Scripts' mail-order pharmacy would dispense a branded product—which required the payment of a guaranteed rebate under the 2019 MSA—but classify it as a generic product.  Only because Express Scripts unilaterally decided to bill the product as generic, Express Scripts did not pay a guaranteed rebate for it.

65.     But Express Scripts' end run is not permitted under the 2019 MSA's express terms.  The 2019 MSA requires guaranteed rebates "█████████████ ████" unless specifically excluded.  Whether the mail-order pharmacy ultimately decides to *bill* for a generic product is immaterial; the only relevant question for purposes of guaranteed rebates under the 2019 MSA is whether a branded product was *dispensed*.

66.     This systematic misclassification resulted in many claims being wrongfully excluded from guaranteed rebates under the 2019 MSA, and the underpayment of guaranteed rebates in excess of $75,000.

## VI.   BCBSM Sends Express Scripts a Notice of Audit Discrepancy

67.     As a result of Express Scripts' breach of its obligations to pay guaranteed minimum rebates for all branded product claims under the 2019 MSA, BCBSM has suffered in excess of $75,000 in damages.

68.     On February 21, 2023, BCBSM sent Express Scripts a letter notifying it of the rebate discrepancies PSG had uncovered with regard to the 2019 MSA. Express Scripts responded in a letter dated March 30, 2023, denying any discrepancy.

## VII.   BCBSM Sends Express Scripts a Notice of Dispute

69.     On April 11, 2023, BCBSM sent a notice of dispute to Express Scripts and requested an executive meeting, as required by the 2019 MSA prior to initiating this lawsuit.

70.     The executive meeting was held on May 22, 2023, and the parties were unable to reach a resolution.

71.     BCBSM is in compliance with, and did not breach, its obligations under the 2019 MSA.

## CLAIMS FOR RELIEF

### First Cause of Action

### Statutory Conversion under M.C.L.A. 600.2919a and Conversion

72.     BCBSM re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

73.     Express Scripts was obligated to remit guaranteed rebates for branded medical supplies to BCBSM.

74.     On July 27, 2020, Express Scripts informed BCBSM that it would not be remitting to BCBSM guaranteed rebates for claims involving branded medical supplies without any legal justification.

75.     On October 23, 2020, Express Scripts informed BCBSM that it would pay these guaranteed rebates to BCBSM, but only if BCBSM agreed to a renewed PBM agreement with Express Scripts.

76.     Express Scripts identified BCBSM's guaranteed rebates as a source of leverage and used them in the negotiations with BCBSM regarding a renewed PBM agreement.

77.     BCBSM refused Express Scripts' attempt to extort a renewed agreement.  Express Scripts has never paid BCBSM the minimum guaranteed rebates owed under the 2019 MSA and instead converted them for its own use.

78.    Those guaranteed rebates specifically identified and used as leverage by Express Scripts belonged to BCBSM and constitute BCBSM's property.

79.    Express Scripts' conduct amounted to converting the guaranteed rebates for branded medical supplies owed to BCBSM.

80.    As a result of Express Scripts' conversion of these guaranteed rebates, BCBSM has suffered damages in excess of $75,000.   These damages can be calculated with reasonable mathematical certainty as each and every claim processed by Express Scripts is recorded, including those for which Express Scripts wrongfully kept guaranteed rebates and used as leverage.

81.    Under Michigan law, BCBSM is entitled to recover three times the amount of damages it has actually sustained, plus its costs and reasonable attorney fees.

## Second Cause of Action

### Breach of Contract (Branded Medical Supplies)

82.    BCBSM re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

83.    The 2019 MSA is a valid and binding contract between Express Scripts and BCBSM.

84.     Under Section █ of the 2019 MSA Schedule █, Express Scripts was obligated to remit to BCBSM "███████████████████████████████

██"

85.     Section █ of the 2019 MSA in turn defines "Brand Name Drugs" as

"████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████"

86.     This definition was a near-perfect carryover from the 2015 MSA, as amended, Section █ of which contained an identical definition of "Brand Name Drugs" with the exception that in the phrase "████████████████████

█████████████" the definition referred to Medco instead of Express Scripts.

87.     Further, Section █ of Schedule █ of the 2019 MSA provides a list of 12 types of claims that are excluded from "Guaranteed Rebates" under Section █, and claims for branded medical supplies are not included on this list.

88.     Branded medical supplies are "Brand Name Drugs" under the 2019 MSA because that was "███████████████████████████████

██████████████"

89.     Express Scripts' express confirmation that guaranteed rebates applies to claims for branded medical supplies also shows that the parties intended the

definition of "Brand Name Drugs" to encompass branded medical supplies when it agreed to the 2019 MSA's terms.

90.    The parties' intent is also evidenced by Express Scripts' course of performance under the 2019 MSA and its course of dealing under the 2015 MSA, *i.e.*, its payment of guaranteed rebates for the first 12 months of the 2019 MSA term, as well as under the 2015 MSA, as amended, which contained a definition of Brand Name Drugs identical to the one used in the 2019 MSA.

91.    Even though the 2019 MSA required Express Scripts to pay guaranteed rebates for claims for branded medical supplies unless excluded under Section █ of Schedule █, on July 27, 2020, Express Scripts pretextually took the position during renewal negotiations for a future PBM contract that branded medical supplies did not count as "Brand Name Drugs" and that the 2019 MSA did not require it to pay guaranteed rebates for branded medical supplies.

92.    Express Scripts subsequently failed to pay such guaranteed rebates to BCBSM.

93.    Express Scripts acted in bad faith when it asserted that branded medical supply claims were not eligible for guaranteed rebates under the 2019 MSA.  On information and belief, Express Scripts knew or should have known that it was obligated to remit guaranteed rebates under the 2019 MSA.  Express Scripts

nonetheless changed its position, the full reasons for which have been concealed from BCBSM and can only be determined through discovery.

94.     Express Scripts thus breached its obligation to pay guaranteed rebates for branded medical supplies to BCBSM.

95.     As a result of Express Scripts' breach, BCBSM has suffered damages in excess of $75,000.   These damages can be calculated with reasonable mathematical certainty as each and every claim processed by Express Scripts is recorded, including those for which Express Scripts wrongfully kept guaranteed rebates.

## Third Cause of Action

## Fraudulent Inducement

96.     BCBSM re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

97.     In or about August 2017, during negotiations of the 2019 MSA, Express Scripts confirmed in writing to BCBSM that guaranteed rebates would apply to claims for branded medical supplies under the 2019 MSA.

98.     When Express Scripts confirmed as much, Express Scripts either knew, or recklessly disregarded, that it did not plan to pay guaranteed rebates for branded medical supplies for the entire term of the 2019 MSA.  Express Scripts understood

the material importance of those rebates to BCBSM and nevertheless confirmed that it would pay them to induce BCBSM to agree to the 2019 MSA.

99. BCBSM reasonably relied on the affirmative misrepresentation by Express Scripts that Express Scripts would remit guaranteed rebates for claims for branded medical supplies.

100. Express Scripts thus fraudulently induced BCBSM into the 2019 MSA.

101. As a result of Express Scripts' conduct, BCBSM has suffered damages in excess of $75,000. These damages can be calculated with reasonable mathematical certainty because each and every claim processed by Express Scripts is recorded, including those for which Express Scripts failed to pay guaranteed rebates.

## Fourth Cause of Action

### Promissory Estoppel

102. BCBSM re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

103. In or about August 2017, during negotiations of the 2019 MSA, Express Scripts confirmed in writing to BCBSM that guaranteed rebates would apply to claims for branded medical supplies under the 2019 MSA.

104. In reasonable reliance on this promise, BCBSM agreed to the 2019 MSA.

105.   Express Scripts is thus estopped from asserting that its promise to remit guaranteed rebates for branded medical supplies under the 2019 MSA is unenforceable.

106.   As a result of Express Scripts' broken promise, BCBSM has suffered damages in excess of $75,000.  These damages can be calculated with reasonable mathematical certainty because each and every claim processed by Express Scripts is recorded, including those for which Express Scripts failed to pay guaranteed rebates.

## Fifth Cause of Action

## Equitable Estoppel

107.   BCBSM re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

108.   In or about August 2017, during negotiations of the 2019 MSA, Express Scripts confirmed in writing to BCBSM that guaranteed rebates would apply to claims for branded medical supplies under the 2019 MSA.

109.   Then, from the effective date of the 2019 MSA, January 1, 2019, until July 27, 2020, Express Scripts continuously represented to BCBSM through its course of conduct that claims for branded medical supplies were eligible for guaranteed rebates under the 2019 MSA, including through payment of these guaranteed rebates in June 2020.

110.   In reasonable reliance on these explicit and implicit representations, BCBSM agreed to the 2019 MSA and held up its end of the bargain for the term of the 2019 MSA, even as Express Scripts did not do the same.

111.   Because Express Scripts represented to BCBSM that claims for branded medical supplies were eligible for guaranteed rebates under the 2019 MSA, and because BCBSM reasonably relied on this representation to its detriment, Express Scripts is estopped from asserting that claims for branded medical supplies were not eligible under the 2019 MSA.

### Sixth Cause of Action

### Breach of Contract (340B Claims)

112.   BCBSM re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

113.   Under Section ▮ of Schedule ▮ of the 2019 MSA, Express Scripts was obligated to pay to BCBSM "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮" Further, Section ▮ of Schedule ▮ provides that "▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮" are "▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮"

114.   For a branded product claim to be excluded from guaranteed rebates as a 340B claim, several criteria must be met, including:  (1) the specific product was prescribed by a 340B-covered entity, (2) it was received by a patient of the 340B-

covered entity, and (3) it was filled by a pharmacy that contracts with, or is operated by, the 340B-covered entity.

115. Notwithstanding such requirements, as identified in PSG's audits, Express Scripts classified certain claims filled by pharmacies operated by, or that contracted with, 340B-covered entities as 340B claims, regardless of whether other necessary criteria were met on any particular claim.

116. Starting on or before January 1, 2019, and for the term of the 2019 MSA, Express Scripts systematically misclassified many claims that were eligible for guaranteed rebates as 340B claims and thereby failed to pay BCBSM guaranteed rebates owed to BCBSM under the 2019 MSA.

117. Express Scripts thus breached its obligation to provide "███████████ ████████████████████████████████████"

118. As a result of Express Scripts' breach, BCBSM has suffered damages in excess of $75,000. These damages can be calculated with reasonable mathematical certainty because each and every claim processed by Express Scripts is recorded, including those for which Express Scripts failed to pay guaranteed rebates.

## Seventh Cause of Action

### Breach of Contract (Branded Claims Billed as Generic)

119.   BCBSM re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

120.   Under Section ▮ of Schedule ▮ of the 2019 MSA, Express Scripts was obligated to pay "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"

121.   Notwithstanding that Express Scripts was obligated to pay guaranteed rebates "▮▮▮▮▮▮▮▮▮▮▮▮" Express Scripts failed to pay guaranteed rebates for brand name products when its mail-order pharmacy dispensed a branded product that it billed as a generic product.

122.   Starting on or before January 1, 2019, and for the term of the 2019 MSA, Express Scripts systematically misclassified many claims for branded products as claims for generic products and thereby failed to pay BCBSM guaranteed rebates owed to BCBSM.

123.   As a result of Express Scripts' breach, BCBSM has suffered damages in excess of $75,000.   These damages can be calculated with reasonable mathematical certainty because each and every claim processed by Express Scripts is recorded, including those for which Express Scripts failed to pay guaranteed rebates.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs BCBSMI and BCN respectfully request that this

Court:

A. Award BCBSM treble damages for Express Scripts' conversion of BCBSM's guaranteed rebates on branded medical supplies.

B. Award BCBSM damages for Express Scripts' multiple breaches of contract.

C. Award costs and attorneys' fees to BCBSM.

D. Award pre-filing interest.

E. Award prejudgment interest on BCBSM's total recovery, including its trebled damages and attorneys' fees.

F. Award post-judgment interest on BCBSM's total recovery, including its trebled damages and attorneys' fees.

G. Award any such other and further relief as may be just and proper.

## JURY DEMAND

BCBSMI and BCN demand a trial by jury on all issues so triable.

Dated: May 23, 2023　　　　　SHEARMAN & STERLING LLP

　　　　　　　　　　　　　　By: */s/ Todd M. Stenerson*
　　　　　　　　　　　　　　Todd M. Stenerson (P51953)
　　　　　　　　　　　　　　Brian C. Hauser (*application for admission forthcoming*)
　　　　　　　　　　　　　　401 9th Street, NW, Suite 800
　　　　　　　　　　　　　　Washington, DC 20004-2128
　　　　　　　　　　　　　　Telephone: +1.202.508.8000
　　　　　　　　　　　　　　Facsimile: +1.202.508.8100
　　　　　　　　　　　　　　todd.stenerson@shearman.com
　　　　　　　　　　　　　　brian.hauser@shearman.com

Jeffrey D. Hoschander (*application for admission forthcoming*)
Mitchell K. Menlove (*application for admission forthcoming*)
Anna Petrocelli (*application for admission forthcoming*)
599 Lexington Ave
New York, NY  10022-6069
Telephone:  +1.212.848.4000
Facsimile:  +1.202.508.8100
jeff.hoschander@shearman.com
mitchell.menlove@shearman.com
anna.petrocelli@shearman.com

BODMAN PLC

Thomas J. Rheaume Jr. (P74422)
Sarah L. Cylkowski (P75952)
1901 Saint Antoine Street
Detroit, MI 48226
Telephone: +1.313.259.7777
trheaume@bodmanlaw.com
scylkowski@bodmanlaw.com

BLUE CROSS BLUE SHIELD OF MICHIGAN MUTUAL INSURANCE COMPANY

Michelle R. Heikka (P66122)
Mercedes Varasteh Dordeski (P70821)
600 East Lafayette Blvd., Suite 1925
Detroit, MI  48226
Telephone: +1.313.225.6541
MDordeski@BCBSM.com
MHeikka@BCBSM.com

*Attorneys for Blue Cross Blue Shield of Michigan Mutual Insurance Company and Blue Care Network of Michigan*

29

JS 44 (Rev. 10/20)                                **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| **I. (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| Blue Cross Blue Shield of Michigan Mutual Insurance Company and Blue Care Network of Michigan | Express Scripts, Inc. |

| **(b)** County of Residence of First Listed Plaintiff   Wayne | County of Residence of First Listed Defendant |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)*<br>Todd M. Stenerson (P51953), Shearman & Sterling LLP, 401 9th Street, Suite 800, Washington, DC 20004(202) 508-8000 | Attorneys *(If Known)* |
|---|---|

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question *(U.S. Government Not a Party)*
☐ 2 U.S. Government Defendant
☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*      Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☒ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br>☐ 880 Defend Trade Secrets Act of 2016 | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit (15 USC 1681 or 1692)<br>☐ 485 Telephone Consumer Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | ☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| | | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332 (Diversity Jurisdiction)
Brief description of cause:
Breach of Contract,quasi-contract, and conversion

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions):*
JUDGE _____ DOCKET NUMBER _____

| DATE<br>May 23, 2023 | SIGNATURE OF ATTORNEY OF RECORD<br>/s/ Todd M. Stenerson |
|---|---|

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

PURSUANT TO LOCAL RULE 83.11

1.          Is this a case that has been previously dismissed?          ☐ Yes
                                                                        ■ No

   If yes, give the following information:

   Court: _____

   Case No.: _____

   Judge: _____


2.          Other than stated above, are there any pending or previously          ☐ Yes
            discontinued or dismissed companion cases in this or any other          ■ No
            court, including state court? (Companion cases are matters in which
            it appears substantially similar evidence will be offered or the same
            or related parties are present and the cases arise out of the same
            transaction or occurrence.)

   If yes, give the following information:

   Court: _____

   Case No.: _____

   Judge: _____


   Notes :